[Crim. No. 4682. Second Dist., Div. Two. Nov. 7, 1951.]

THE PEOPLE, Respondent, v. BERNARD COHEN, Appellant.

Murray M. Chotiner for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

MOORE, P. J.—Appellant was convicted of feloniously engaging in bookmaking upon the result of a trial and contest of speed and power of endurance between horses, a crime denounced by section 337a, subdivision 1, of the Penal Code.[1]

---

[1]Penal Code, section 337a. ''Every person,

''1. Who engages in pool-selling or book-making, with or without writing, at any time or place; or

''2. Who, whether for gain, hire, reward, or gratuitously, or otherwise, keeps or occupies, for any period of time whatsoever, any room, shed, tenement, tent, booth, building, float, vessel, place, stand or inclosure, of any kind, or any part thereof with a book or books, paper or papers, appa-

He demands a reversal upon the asserted insufficiency of the evidence and errors of law occurring at the trial. He was accused jointly with three others with whose fortunes the result of this appeal is not concerned.

### EVIDENCE SUFFICIENT

■ About 7 o'clock on the morning of October 12, 1950, Police Officers Duncan and Brooks stationed themselves in a position to observe the premises numbered 1003 on a popular boulevard of Los Angeles. Half an hour later defendant Rose unlocked the front door of those premises, entered and sat at a desk for 10 minutes. On emerging from 1003 he

ratus, device or paraphernalia, for the purpose of recording or registering any bet or bets, or any purported bet or bets, or wager or wagers, or any purported wager or wagers, or of selling pools, or purported pools, upon the result or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of man or beast, or between men, beasts, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever; or

"3. Who, whether for gain, hire, reward, or gratuitously, or otherwise, receives, holds, or forwards, or purports or pretends to receive, hold, or forward, in any manner whatsoever, any money, thing or consideration of value, or the equivalent or memorandum thereof, staked, pledged, bet or wagered, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of man or beast, or between men, beasts, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever; or

"4. Who, whether for gain, hire, reward, or gratuitously, or otherwise, at any time or place, records, or registers any bet or bets, wager or wagers, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of man or beast, or between men, beasts, or mechanical apparatus, or upon the result or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever; or

"5. Who, being the owner, lessee or occupant of any room, shed, tenement, tent, booth, building, float, vessel, place, stand, enclosure or grounds, or any part thereof, whether for gain, hire, reward, or gratuitously, or otherwise, permits the same to be used or occupied for any purpose or in any manner prohibited by subdivisions 1, 2, 3 or 4, of this section; or

"6. Who lays, makes, offers or accepts any bet or bets, or wager or wagers, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of man or beast, or between men, beasts, or mechanical apparatus.

"Is punishable by imprisonment in the county jail or state prison for a period of not less than thirty days and not exceeding one year.

"This section shall apply not only to persons who may commit any of the acts designated in subdivisions 1 to 6 inclusive of this section, as a business or occupation, but shall also apply to every person or persons who may do in a single instance any one of the acts specified in said subdivisions 1 to 6 inclusive."

was placed under arrest. In his shirt pocket were found four slips of paper, received in evidence as exhibit 1. The officer took from Rose a key with which he entered the building. He found in the desk drawer one envelope marked "Cecil" containing 11 slips of paper (exhibit 2), three envelopes, (exhibits 3a, 3b and 3c) each marked "King," each holding slips of paper. Leaving all envelopes where they were, Duncan removed Rose to Officer Brooks on a neighboring street and returned to the boulevard where he observed defendants Frink and Richards enter 1003. He entered to find Richards holding the "King" envelopes. He searched Mrs. Frink from whom he took a key and a check (exhibit 4). Having removed Frink and Richards to Brooks and the police car, Duncan resumed his watch over the premises and was soon rewarded by the approach of a black sedan moving southward on the boulevard. As it passed the premises under surveillance it slowed down perceptibly as its two occupants both looked toward 1003. They proceeded two blocks, made a U-turn, again passed 1003, retarded their speed, continued looking at the premises, turned at the next corner and repeated the circuit. Officer Brooks rejoined his companion and the two officers together stopped the sedan in which appellant and a companion were passengers and placed them under arrest. Brooks promptly took a yellow sheet from appellant's hands and several pieces of paper from his pockets. The yellow sheet was subsequently marked exhibit 6.

One of the slips (exhibit 1) taken from Rose was an "owe sheet." It contained the names of betters and the amounts of the debt of each to agent Cecil and the sums owed by him to the listed betters. One of the betting markers showed the wagers recorded, the amounts won and lost, and that "Leroy" owed agent Cecil $12.75. The second betting marker showed bets that had been placed on certain horses designated by numbers. The amount wagered on that marker was $198 and the amount won by the listed horses was $401.15. The subtraction of the wagers from the winnings gave $203.15 owed to cash by Cecil. The third marker contained similar notations. All bore date October 11, 1950.[2] By the "spot

[2]*Bookmaking in Southern California.*

The following was established by expert testimony: Bookmaking paraphernalia consists of owe sheets, betting markers, top sheets, run-down sheets or California Digest, telephones, pencils, scratch paper and racks to hold the markers. The owner of a book is in contact with many agents of individual betters. The agent is the base of the pyramidal scheme. The agent's name is put at the top of the dated marker, the better's

checking'' the markers and the owe sheet with California Digest of October 11, 1950, it was revealed by aid of the testimony of the expert witness that the horses listed in the markers had run on that day. Each was stamp-dated "October 11''; some bore the number of the horses that ran on that day. Some showed the amount of each wager and the totals of the winnings and losses and the net sum due by the agent to his principal.

The top sheet in exhibit 3a was a recapitulation written on adding-machine tape whose figures corresponded with those on one card written with pencil by appellant. Also included in the same packet were many yellow sheets. Each was a professional type betting marker. Each bore the name of a better and the initial of the agent; each contained the number of the horse; the sum wagered to win or to place, the amount won and the loss to be collected from or to be paid to the agent whose initial is on the marker.

Another envelope taken from the desk contained many professional type markers dated "10-10" and a top sheet. Below the double line of the top sheet were memoranda in the handwriting of appellant. Another envelope contained betting markers dated October 9 showing the wagers, betters and agent and a top sheet with a list of bets, betters, losses and winnings of each and the initial of the agent. The writing on the latter sheet below the top double line was that of appellant. A spot comparison of the documents in exhibits 3a and 3b with the California Digest disclosed that the horses whose numbers were on the betting markers ran on October 10 and 11, 1950. And the sport section of a metropolitan daily published in Los Angeles established that the horses identified by the California Digest had paid through the parimutuel machines at the tracks indicated by the digest the identical winnings shown on the markers of those dates.

The yellow sheet with pencil markings was taken by Officer

name on the left at the top. In the first column is a space for the index numbers of the horses which appear on the California Digest. The next column is for the possible parlay with the serial number of the horse. In the next three columns the bets are recorded. In the last two columns are entered the winnings or losses incurred by the bookmaker in favor of or against the better. These are recorded at the "phone spot" or office by a clerk. At the end of the day these sheets are all taken from the phone spot to an accounting spot designated by the owner where the recapitulation of all the sheets is made. Each sheet is totaled by the owner of the book or his accountant on a "top sheet." At the bottom of each top sheet is the letter C meaning to collect from, or P meaning to pay so much to the better.

Brooks from appellant at the time of his arrest. It was accompanied by two tapes from an adding machine and two other yellow sheets and a white sheet with writing. At the trial they were marked exhibit 7. Also taken from appellant was an exemplar of his own handwriting, at the trial marked exhibit 10. The first white tape in exhibit 7 carried the name "Cecil, October 11" and printed numbers whose aggregate sum, $114.90, followed. Other printed numbers were followed by their aggregate amount, 22760, under which was written in pencil 11490, and beneath it appears in writing P11270, the difference of the two former numbers. The figures preceded by "C" on the bottoms of the betting markers in exhibits 1 and 2 are the identical figures found in the first group on tape number 1 in exhibit 7 while the figures preceded by "P" on the bottom of the betting markers in exhibits 1 and 2 are the same as the second group of figures added on tape number 1 of exhibit 7.

Tape number 2 in exhibit 7 contains printed figures with names written to the left of them. Each name or initial on tape number 2 and its figures are found on exhibit 6. The yellow sheet No. 1 in exhibit 7 has names with figures opposite. Some of the same names are found in exhibit 6 but the figures opposite them are different. Yellow sheet No. 2 in exhibit 7 was patterned after yellow sheet No. 1 although its names and figures were different from those in sheet No. 1. The testimony of the witness Sloan established that the pencil writing on the two yellow sheets is that of appellant.

Also in exhibit 7 is a large white sheet bearing a list of names with figures opposite them including the name "King." By a comparison of these names and figures it is found that they appear in the same relation to each other on exhibit 6 and the writing on the white sheet is that of appellant.

It is thus established that appellant was engaged in bookmaking, denounced by section 337a, Penal Code. If he was not a bookmaker, why was the list of betters and winners written by his hand in the books taken from the possession of bookmakers? If he was not a bookmaker, why was he searching for someone before 10 o'clock in the morning at 1003, a rendezvous for bookmakers? Inside those premises two bookmakers were arrested. In their possession were betting markers and owe sheets and the writing of appellant. If he had been innocently requested by another person in Nevada to deliver the lists to 1003 as he testified, he would have stopped in front of that location and delivered the package

instead of driving twice around the block watching eagerly for a friend to emerge from the building.

His possession of $4,900 at the time of his arrest is a potent link in the chain of circumstances to prove his vocation. A person of ordinarily honest habits in importing so large a sum from Nevada to California would have made use of bank exchange. While the denials and explanations given by appellant from the witness stand might have warranted acquittal of the charge, the trial judge did not choose to believe him but proceeded to rely upon the inferences reasonably drawn from the circumstances established and from his testimony that within the two preceding days he had by gambling in Nevada increased $500 to about $4,000; his method of transporting such moneys to California; that he had written in Las Vegas the list of figures on exhibits 7, 3a, 3b and 3c at the dictation of his friend Fisher with whom he traveled to Los Angeles; his manner of approaching 1003; the possession by his codefendants of betting markers written by his hand; facts that the groups of papers, the betting markers and owe sheet taken from appellant corresponded with the names, initials and figures on the owe sheets and markers taken from the desk at 1003, and from the possession of the other defendants and that the owe sheets taken from Rose and the tapes taken from appellant both had the handwriting of appellant. These facts together with the conduct of appellant on the witness stand warrant the inference that on October 12, 1950, a book of bets was made or being made and that appellant was a participant in the inglorious enterprise.

The handwriting on the owe sheets attached to exhibits 3a, 3b, 3c, 7 and 10 is all or in part that of appellant. At the time of his arrest he had a tape with figures stamped on it. They are the same figures as those preceded by C or P on the markers taken from Rose. Some of these papers were written by appellant. The names Cecil and King and the letter K were found on some of the papers in appellant's possession.

The judgment of the trial court will not be reversed by a contrast of the evidence for and against a conviction. That court is still the forum in which the facts of an issue are tried and so long as some substantial evidence to support the implied finding exists, there can be no reversal.

Before a judgment of the trial court can be set aside on appeal "it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to

support the conclusion in the court below." (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) The evidence offered in behalf of appellant is presumed to have been weighed along with that against him or it was rejected by the court as wholly worthless. In either event, the determination of the trial court is final. (*People* v. *Von Benson,* 38 Cal.App. 2d 431, 434 [101 P.2d 527].)

 The trial court had the power and authority to determine that the narrative of appellant was fabricated and that the facts proved by the state warrant the finding of appellant's guilt. (*People* v. *Froehlich,* 65 Cal.App. 502, 506 [224 P. 471]; *People* v. *Ross,* 100 Cal.App.2d 116, 123 [223 P.2d 85].)

### Denying a Severance

 There was no error in denying appellant's motion for a separate trial. He contends that because his codefendants were accused of violating subdivision 2 of section 337a he would be handicapped by the necessity of being present during the entire trial. A person jointly accused with the others does not have a right to a separate trial. He has merely the right to ask for it. The court is vested with discretion to grant or deny the request. (*People* v. *Burton,* 91 Cal.App.2d 695, 714 [205 P.2d 1065].) A severance may be properly denied where there is a common element of substantial importance in the commission of the crimes. It will not be granted because damaging testimony or confession of a codefendant might be admitted. Moreover, had appellant been granted a separate trial, almost all of the evidence of the activities of the codefendants at premises 1003 would have been admissible since the documents in his handwriting were found there showing the same figures as those on the documents found on his person.

### Telephone Conversation Harmless

 Officer Duncan testified to having answered the telephone at 1003 when the voice asked: "What in the hell is going on in there? Officer, "Nothing. Do you have anything for me?" Voice, "No." After a motion by a codefendant to strike the conversation, appellant asked that it be allowed to remain in the record. Therefore, the testimony having been invited by appellant the denial of the motion will not be disturbed on appeal. (*People* v. *Redman,* 39 Cal.App. 566, 569 [179 P. 725].)

## Appellant Had $4,900

There was no error in overruling a general objection to the testimony of the officer that he found on appellant at the time of arrest $4,900. The expert proof showed that the taking of wagers on horse races and the making of books involves the collection of moneys and that at the end of a day's work the moneys and the owe sheets are taken to "a drop spot" where an accounting is made and winnings are paid. No person astute enough to attempt to engage in a criminal enterprise would deposit his money in a bank and disburse it to the successful betters by check. Holding such funds in the form of legal tender expedites the consummation of the business at hand and renders difficult detection by the authorities. After proof of appellant's participation in the bookmaking and his presence near the scene of the activities of bookmakers it was not error to admit evidence of his possession of $4,900. It was a fair inference that the money he had was that which he and his agents had collected from betters or which he had assembled to pay them. (*People* v. *Carroll*, 79 Cal.App.2d 146, 148 [179 P.2d 75].)

## Evidence of Conversations With Appellant

Appellant contends that the corpus delicti was not established and therefore evidence of his extrajudicial statements was improperly admitted. But such betting markers and owe sheets were found at 1003 as are commonly used by bookmakers, dated the 9th, 10th and 11th of October; they tended to prove that wagers had been laid on horse races and recorded on the markers by agents "Cecil" and "K" and that recapitulations of the amounts on the markers were shown on the "owe sheets" and some of the entries had been made by appellant; that other papers showed names and figures written on cards similar to the owe sheets found at 1003. Such evidence established the corpus delicti. From the presence of scratch sheets, owe sheets and betting markers at any place, it is a fair inference that bookmaking has been carried on there. While there was no evidence that scratch sheets were found at 1003, it was proved that certain numbers on the markers represented specific horses running in the races as designated in California Digest and that such publication is distributed only to bookmakers and others interested. There was no error in admitting the conversations with appellant.

OTHER DOCUMENTS

Documents not written by appellant but found in the premises 1003 with papers in appellant's handwriting tend to prove that bookmaking was being carried on. From such proof the facts at issue herein were logically inferable. (Code Civ. Proc., § 1870, subd. 15.) The presence of any bookmaking paraphernalia or owe sheets or betting markers at 1003 tended to prove the crime. (*People* v. *Sam Lung,* 70 Cal. 515, 517 [11 P. 673]; *People* v. *Hatfield,* 77 Cal.App. 212, 217 [246 P. 95]; *People* v. *Grayson,* 83 Cal.App.2d 516, 520 [189 P.2d 285].) Especially is this true where there is evidence of the accused's connection with it. (*People* v. *Partee,* 70 Cal.App.2d 736, 739 [161 P.2d 586].)

Appellant deems himself to be aggrieved by the court's refusal to exclude exhibits 1, 2, 3, 4, 6, 7, 8, 11, 12, 13 and 14. His assignment of error with respect to those documents is without merit. Exhibits 1 and 2 taken from 1003 consisted of betting markers and owe sheets dated October 11 bearing the name Cecil, the letters C and P. At the time of appellant's arrest he carried on his person a paper tape dated October 11 bearing the name ''Cecil'' and the same figures found on exhibits 1 and 2. Also the figures preceded by ''C'' on his papers had been added with the same sum as shown on exhibits 1 and 2 and those sums had been subtracted from the total of the ''C'' numbers leaving the same result ''P-11270'' on exhibit 7. From the fact that appellant carried in his pocket duplicates of betting markers and owe sheets taken from the codefendants it was a fair inference that appellant was connected with the parties who carried exhibits 1 and 2. Therefore, the admission of exhibits 1 and 2 was a correct ruling. (*People* v. *Steccone,* 36 Cal.2d 234, 239 [223 P.2d 17].)

Neither was there error in admitting the other exhibits specified for similar reasons. Inasmuch as the paper containing the names of the betters and the amounts of their debts or net winnings on the owe sheet were stapled to the markers in each of the envelopes in exhibit 3 and were in the handwriting of appellant, it was clearly to be inferred that appellant was either the owner of the book or was in the latter's employ, proving his guilt. (*People* v. *Greco,* 47 Cal. App.2d 628, 633 [118 P.2d 886].) The exclusion of exhibits 3a, 3b and 3c would have been error.

There was no error in admitting exhibit 4, a check payable to ''Mrs. King,'' taken from defendant Frink by the officers. On each envelope in exhibit 3 was written the name

"King." The name so appearing on the packet containing markers and owe sheets indicates according to the expert that King was the agent and his initial "K" appears on the owe sheet with the names of his betters, and the amounts of their net winnings or net losses. The check was properly admitted as tending to connect the agent whose owe sheet had been written by appellant with the latter.

Exhibit 6 was properly admitted. It contains a list of names and figures. "Cecil" is one of the names. The betting markers each contained the name "Cecil" which indicated that the bets were made with him. Appellant's only explanation of exhibits 6 and 7 was that they were his and the people listed "were people that he owed money and people that owed him money." He refused to tell who they were "because he was afraid it would be held against him." Considering his answer to the officer concerning the lists he carried and the fact that they included "Cecil, King" and "K" it is fairly inferable that his documents were a part of the bookkeeping system of the bookmaker for whom Cecil and King worked as agents. Not only did the papers appellant carried furnish proof of bookmaking and selling, but their contents and their being on his person, in his handwriting, establish his participation in the making and the sales and were therefore properly admitted.

Exhibit 8 is a harmless, meaningless card of a real estate saleslady.

Exhibits 11, 12 and 13 are copies of California Digest. While they were not connected with appellant by his possession of them, they were pertinent to the issues in that the paper is bookmaking paraphernalia. It is delivered surreptitiously to bookmakers only and "people interested in bookmaking." It is a "rundown sheet" carrying the names and "index numbers of all horses running at various tracks throughout the United States for the particular date." The paper is used for the purpose of comparing betting markers with the information carried by the digest which shows the horses that actually ran on the date of the publication. The index numbers for horses listed in the digest were used by the agents in making up betting markers. From the fact that appellant wrote on the owe sheets attached to the betting markers in evidence the court inferred his participation in the making of the markers.

Exhibit 13 is a copy of the Los Angeles Times of October 12, 1950. It was used by the expert witness to com-

pare the names of the horses run on October 11, 1950, appearing in the Times with those listed in the California Digest. Its columns indicate that horses named in the Digest with their index numbers on the markers in exhibit 2a had run at tracks and in the races specified by the Digest. Also, the Times published ''pay-offs'' which corresponded with the payoffs indicated on the markers. It was proper evidence upon which to base an inference that the data on the betting markers were not meaningless, but were part of a system used by bookmakers generally. (*People* v. *Vertlieb,* 22 Cal.2d 193, 196 [137 P.2d 437] ; see *People* v. *Newman,* 24 Cal.2d 168, 174-176 [148 P.2d 4, 152 A.L.R. 365].)

Exhibit 14 is a leather case for carrying cards. If the handwriting on some of the cards is not that of appellant, then the exhibit was harmless.

The judgment and the order denying appellant's motion for a new trial are affirmed.

McComb, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 6, 1951.