Filed 9/12/24  P. v. Vargas CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D083315 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF2200363) |
| RAYMOND ANGEL VARGAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Dean Benjamini, Judge.  Remanded for resentencing, and affirmed in all other respects.

Mi Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Daniel Rogers and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

Raymond Angel Vargas appeals a pair of concurrent sentences the trial court imposed after a jury found him guilty of second degree robbery and attempted voluntary manslaughter.  He contends the sentences should be reversed because the record either affirmatively reveals the trial court did

not understand the scope of its sentencing discretion or is at least ambiguous on this point. He further contends the trial court should have stayed one of the sentences because, even though he was convicted of two different offenses, his behavior that led to the convictions comprised just one single indivisible course of conduct. We agree with the second contention, but not the first. Hence we remand for resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

One evening in February of 2022, 21-year-old Vargas met in an alley with 17-year-old John Doe to complete a previously arranged sale of marijuana. In the alley, Doe handed the marijuana to Vargas, and Vargas handed Doe what it took Doe just seconds to realize was counterfeit money. Immediately upon realizing that he had had been deceived, Doe commenced to give chase, intending "to beat [Vargas] up."

After Doe had advanced just a few steps, Vargas wheeled around with a gun in his hand and shot Doe in the thigh. Then a scuffle ensued, in which Vargas fired seven more bullets—striking Doe in the left and right shoulders, twice in the abdomen, and twice in the neck. As Doe clung to Vargas's leg, Vargas said "let go." Whereupon Doe released his grip, and Vargas fled.

### A. The Verdicts

The People charged Vargas with attempted murder[1] and second degree robbery, and the jury found him guilty of attempted voluntary manslaughter and the charged offense of second degree robbery. For enhancements, the jury found: on the attempted homicide (count one), that Vargas had used a firearm within the meaning of Penal Code section 12022.5, subdivision (a);[2]

---

[1] Doe survived. Bullet fragments remain lodged in his body.

[2] All statutory references are to the Penal Code.

2

and, on the robbery (count two), that he had used a firearm within the meaning of section 12022.53, subdivision (d). In addition, it found on both counts that Vargas had personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a).

**B.   The Sentencing**

At sentencing, the trial court imposed concurrent terms of 14 years six months on count one and 16 years on count two.

### 1.   *The Trial Court's Remarks on the Relationship Between the Two Counts*

In explaining its sentencing rationale, the trial court began with neither count one nor count two, but instead with its views regarding the relationship *between* the two counts—and with a decision it had made to dismiss the section 12022.53, subdivision (d) firearm enhancement as to count two, and replace it with a lesser included and less severe section 12022.5, subdivision (a), firearm enhancement (i.e., the same type of firearm enhancement found as to count one).[3]

#### a.   **The Court's Rationale for Reducing the Count One Firearm Enhancement**

The trial court explained its decision to reduce the firearm enhancement, as follows:

> "In this particular case, there is one issue that I have a very tough time getting over when I look at it, and that is there was essentially one incident. It was . . . very fast moving, fast developing from completed transaction to

---

[3]   A section 12022.5, subdivision (a), firearm enhancement is less severe than a section 12022.53, subdivision (d), firearm enhancement in that, whereas the former articulates a sentencing triad of 3, 4, or 10 years, the latter mandates 25 years to life. Explaining its decision to use a discussion of the firearm enhancements as its launchpad for sentencing, the trial court said: "I want to address . . . 12022.53 first, because to a large extent that drives . . . or . . . affects everything else."

(John Doe) realizing that he had been defrauded in the transaction, so to speak, and then within a short period of time the physical interaction escalated from taking a few steps to multiple shots fired over mere seconds. I mean, we're talking a couple seconds.

"The robbery is inseparable from the attempt to kill. They go hand in hand.

"[¶ . . . ¶]

"The taking out the gun to the shots being fired is almost instantaneous. It . . . happened so . . . quickly. **Those eight shots**, seven of which found their mark, happened within an incredibly short period of time in the tumult of an ongoing physical interaction. **To separate them out and say one was the . . . attempt[ed] voluntary manslaughter, and the other was robbery, I think [is] to do something which is almost impossible to do.** They were part and parcel of one transaction.

"When . . . someone attempts to kill . . . in a mitigated fashion, either . . . heat of passion . . . or an honest unreasonable belief in the need to defend oneself[,] . . . and when the legislature says that in that circumstance the appropriate enhancement is a 12022.5(a) with a triad of three, four, or ten [years in prison], it's very difficult to say that [that] exact same conduct . . . [that] constituted the robbery and the attempted voluntary manslaughter . . . suddenly transforms to life under 12022.53(d) for the exact same conduct . . . , and that's something that I can't lose sight of in this particular case.

**"If the robbery and the attempted voluntary manslaughter were factually distinct, I think it would be a different story, but . . . to separate these out into two distinct fact patterns which merit two distinct punishments under different constructs, I think goes beyond what is appropriate in this case.**

"In every case, it's factually different. If there was a robbery, and . . . Doe was shot initially, and then . . . a minute later he's coming at Mr. Vargas, and then Mr.

4

Vargas shoots him again, . . . that would be a different situation.  But here, because everything was so wrapped up in one, two, maybe three seconds . . . , I just don't think you can separate them like that, and I think under those circumstances, the appropriate disposition—or the appropriate application is the lesser of the 12022.5(a)."

Citing these views and section 1385, subdivision (c)(2)(C)—which speaks to the dismissal of enhancements that would yield a sentence exceeding 20 years[4]—the court reduced the firearm enhancement as indicated above.

### b. The Court's Rationale for Imposing the Count One and Count Two Sentences Concurrently

In addition to discussing the relationship between the two counts in the context of its decision to reduce the firearm enhancement, the trial court also discussed this topic in the context of its decision to run the two sentences concurrently.  In this regard, it said:

"I . . . believe . . . the crime[s] did not have predominantly independent objectives, . . . did not really encompass separate acts of violence, and . . . did not happen in separate different places indicating anything other than one continuous course of conduct; therefore, I think . . . the concurrent sentencing is . . . appropriate."[5]

---

[4]    Section 1385, subdivision (c)(2)(C), provides that, when "an enhancement could result in a sentence of over 20 years[, it] shall be dismissed."  (But see § 1385, subd. (c)(1), (2) [delineating exceptions "if dismissal of th[e] enhancement is prohibited by any initiative statute" or upon a "find[ing] that dismissal of the enhancement would endanger public safety"].)

[5]    These remarks track the factors set forth in California Rules of Court, rule 4.425(a), which states that:  "Factors affecting the decision to impose consecutive rather than concurrent sentences include . . . whether or not: (1) [t]he crimes and their objectives were predominantly independent of each other; (2) [t]he crimes involved separate acts of violence or threats of violence; or (3) [t]he crimes were committed at different times or separate places,

## 2.    *The Trial Court's Remarks on the Danger Vargas Might Pose to Others if Granted Probation*

The trial court made no finding that the "dismissal of [any] enhancement would endanger public safety" (§ 1385, subd. (c)(2).)  But, when determining that probation would be inappropriate, it said "there is a likelihood . . . if [Vargas] is not in prison that he will be a danger to others."

## 3.    *The Terms of Incarceration*

### a.    The Terms of Incarceration for Count One (Attempted Homicide)

The trial court arrived at the 14 year six month term it imposed on count one by tallying:  (i) the low term of 1.5 years for attempted voluntary manslaughter (§§ 193, subd. (a), 664, subd. (a)); (ii) the high term of 10 years for the firearm enhancement; and (iii) a term of 3 years for the great bodily injury enhancement.

In arriving at these terms, the trial court began by focusing on mitigating and aggravating circumstances.  In mitigation, it found:  the crime had been committed under unusual circumstances; Vargas had been a victim of childhood trauma; the trauma might have been connected to the crime; and Vargas was under 26 years of age. (See California Rules of Court, rule 4.423(a)(3), (b)(3), (4) and (6).)  In aggravation, it noted (in keeping with findings it had made at the time of trial):  that "the crime . . . [had] involved great violence and callousness"; that Vargas had engaged in violent conduct that indicates a serious danger to society; and that Vargas had been on probation at the time of the offenses.  (See rule 4.421(a)(1), (b)(1) and (4).)

Weighing these mitigants and aggravants, the trial court concluded that "the mitigating factors outweigh the aggravating factors to the point

---

rather than being committed so closely in time and place as to indicate a single period of aberrant behavior."

that the appropriate term is the low term of 1 year and 6 months." Having thus applied the low term to the homicide, the court then proceeded to the firearm enhancement and concluded that the escalating lethality inherent in Vargas's firing so many bullets into Doe even after Doe had been incapacitated was a circumstance that tilted the balance toward the high term:

> "[M]oving on to the enhancement under 12022.5(a), I think things change significantly. Although Mr. Vargas might have felt the need to fire the weapon, the number of times . . . it was fired changes everything. There were no attempts to stave off a potentially deadly confrontation.

> "[H]e tried to move away and go backwards. . . . I think that the evidence does show that, but there . . . could have been a warning shot. [L]ook, there was one shot fired at the leg. [C]ertainly after that met its mark[, it] should have been sufficient at that point for Mr. Vargas to have backed away further and not continue to shoot and shoot and shoot and shoot. Doe was getting incapacitated more and more with each shot. And I think that the great violence and bodily harm and the viciousness and callousness increase with each shot.

> "[I]n those circumstances, that use of the gun I think merits the upper term of 10 years."

Lastly, the court addressed the great bodily injury enhancement and said: "[T]here's not much to discuss there, that's an additional term of 3 years."[6]

    Then the trial court turned to count two.

### b.    The Terms of Incarceration for Count Two (Robbery)

    On count two, the trial court arrived at the 16-year term by tallying: (i) the middle term of 3 years for robbery (see § 213, subd. (a)(1)(B)(2); (ii) the

---

[6]    Unlike sentencing provisions that articulate a triad of alternative terms, section 12022.7, subdivision (a), articulates just one single term of three years.

high term of 10 years for the reduced firearm enhancement; and (iii) a term of 3 years for the great bodily injury enhancement.[7]

After the sentencing, Vargas timely appealed.

## II. DISCUSSION

As noted *ante*, Vargas assigns two points of error. We examine each of these points in the order in which Vargas presents them.

## A. Discretion Under Section 1385

Vargas's first point of error is that the record either "affirmatively shows that the trial court did not understand the scope of its sentencing discretion under section 1385" or is at least "ambiguous" on this point. This argument tracks a pair of closely related principles. The first of these principles is encapsulated by a statement in *People v. Fuhrman* (1997) 16 Cal.4th 930 (*Fuhrman*) that, "where the record *affirmatively* discloses that the trial court *misunderstood* the scope of its discretion, remand to the trial court is required to permit that court to impose sentence with full awareness of its discretion." (*Id.* at p. 944, citing *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 532.) The second principle may be discerned in opinions in which reviewing courts have found the level of certainty articulated in *Fuhrman* to be lacking, but have harbored qualms nonetheless. (See, e.g., *People v. Lua* (2017) 10 Cal.App.5th 1004, 1021 ["We do not agree . . . that the record conclusively establishes that the trial court misunderstood the scope of its discretion to strike one or more of the enhancements, but we do find that some of the trial court's comments during

---

[7] The trial court also imposed an additional one-year term for each of the out-on-bail enhancements (resulting in a total of 2 years for both), but stayed this portion of the sentence because "there ha[d] been no conviction on the . . . offenses" to which the bail pertained. In addition, it awarded credit for time served.

8

sentencing raise serious doubts in that regard."].) But juxtaposed against these two principles is a third principle, also set forth in *Fuhrman,* that: "with regard to cases in which the record is silent as to the trial court's understanding of the scope of its discretion [¶] the appropriate course . . . is for an appellate court to deny the request for remand." (*Fuhrman,* at p. 944–945.)

Here, we conclude that what the record reveals about the trial court's understanding of the scope of its discretion under section 1385 is neither a lack of understanding nor ambiguity, but rather: silence. In this regard, we note that the observations Vargas offers to support his contention that the record "affirmatively discloses" that the trial court misunderstood its discretion, or is ambiguous on this point, are not affirmative disclosures at all. Rather, they are inferences that Vargas has *chosen* to draw from the record's silence. Thus, for example, Vargas argues that:

> "The record affirmatively shows that the trial court misunderstood the scope of its discretion under section 1385 . . . [because it] *fails to* show *that the court mentioned* its discretion to dismiss one or more enhancements under section 1385 based on the mitigation factors outlined in subdivisions (c)(2)(B), (D), (E) or (c)(4)."[8]

---

[8] The first three of these four subdivisions pertain to: the existence of multiple enhancements (subd. (c)(2)(B)); mental illness (subd. (c)(2)(D); and prior victimization or childhood trauma (subd. (c)(2)(E). The fourth (subd. (c)(4)) is a catchall, indicating that "[t]he circumstances listed in [subdivision (c)(2)] are not exclusive." (§ 1385.)

In like fashion, Vargas also argues that: "[t]he record *lacks any statement* that dismissal of one or more enhancements would not be in the furtherance of justice or . . . would endanger public safety."[9] And he further argues that:

> "The trial court's comments *fail to mention* its discretion to dismiss one or more enhancements under section 1385, subdivisions (c)(2)(B), (D), (E) or (c)(4) and *disclose no statement* of reasons for declining to exercise its discretion under these statutory provisions."

But neither a failure to show, nor the absence of a mention, nor the lack of a statement is an affirmative showing. Instead they are its opposite: silence. Thus these observations do not establish error. (Cf. *People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527 ["in light of the presumption on a silent record that the trial court is aware of . . . [its] statutory discretion at sentencing, we cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of that discretion"].)

## B.    The Multiple Punishment Argument

### 1.    *The Applicable Rule*

Vargas's second point of error is that the trial court should have stayed one of the sentences because, even though he was convicted of two different offenses, his behavior that resulted in the convictions comprised just one

---

9    Section 1385, subdivision (c)(1), states that, "Notwithstanding any other law, the court shall dismiss an enhancement *if it is in the furtherance of justice to do so*, except if dismissal of that enhancement is prohibited by any initiative statute." (Italics added.) Section 1385, subdivision (c)(2) provides (in part) that, "[i]n exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present" and that "[p]roof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, *unless the court finds that dismissal of the enhancement would endanger public safety*." (Italics added.)

10

single indivisible course of conduct. This multiple punishment argument is rooted in subdivision (a) of section 654, which says: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

As our Supreme Court has explained:

> "Section 654 does not preclude multiple convictions but only multiple punishments for a single act or indivisible course of conduct. [Citation.] 'The proscription against double punishment . . . is applicable where there is a course of conduct which violates more than one statute and comprises an indivisible transaction punishable under more than one statute. . . . The divisibility of a course of conduct depends upon the intent and objective of the actor.' "

(*People v. Miller* (1977) 18 Cal.3d 873, 885). " '[I]f all the offenses are incident to one objective, [then] the defendant may be punished for any one of them but not for more than one.' " (*Ibid*.) Thus, the Court has stated that "section 654 is applicable to 'limit punishment for multiple convictions arising out of . . . a course of conduct deemed to be indivisible in time in those instances wherein the accused entertained a principal objective to which other objectives, if any, were merely incidental' " (italics omitted). (*Ibid*., quoting *People v. Beamon* (1973) 8 Cal.3d 625, 639 (*Beamon*).) But, "[i]f he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*Beamon*, at p. 639.)

11

### 2. *The Mechanics of the Rule*

How the rule just discussed is applied in practice has been explained as follows:

> "Section 654, as construed by our Supreme Court, permits the *imposition* of sentences on separate crimes incident to one objective, but precludes the *execution* of the multiple sentences in a fashion which permits the defendant to be punished in a manner greater than the punishment provided for the greater of the crimes. [Citations.] That result is accomplished in the trial court by staying execution of the sentence on the lesser crime[10] with the stay to become permanent when the judgment on the greater offense is satisfied."

(*People v. Lowe* (1975) 45 Cal.App.3d 792, 795, italics added (*Lowe*); see also *People v. Deloza* (1998) 18 Cal.4th 585, 591, 594 (*Deloza*) ["if a defendant commits two crimes, punishment for one of which is precluded by section 654, that section requires the sentence for one conviction to be imposed, and the other imposed and then stayed"].) A stay is required because "[s]ection 654 does not allow any multiple punishment, including either concurrent or consecutive sentences." (*Deloza,* at p. 592.)

### 3. *Challenges in Applying the Rule*

As several authorities have observed, the rule of section 654, subdivision (a), can be challenging to apply. (See, e.g., 3 Witkin, Cal. Criminal Law (4th ed. 2023) Punishment, § 248 ["the rule is easily stated, but has proven difficult to apply"]; *In re Adams* (1975) 14 Cal.3d 629

---

10 The "lesser crime" is the crime for which the lesser punishment is imposed. (See *People v. Butler* (1996) 43 Cal.App.4th 1224, 1248 ["[w]here multiple punishment has been improperly imposed, 'the proper procedure is for the reviewing court to modify the sentence to stay imposition of the lesser term.' "]; *People v. Adams* (1993) 19 Cal.App.4th 412, 447 [under section 654, the "appropriate procedure on appeal is to eliminate the effect of the judgment as to the lesser offense as far as the penalty alone is concerned."])

["Notwithstanding the apparent simplicity of its language, the applicability of section 654 in a particular case often involves a difficult analytical problem."]; *Beamon, supra*, 8 Cal.3d at p. 639 ["Because of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an 'act or omission,' there can be no universal construction which directs the proper application of section 654 in every instance"]; *People v. Nguyen* (1988) 204 Cal.App.3d 181, 193 (*Nguyen*) ["Bluntly stated, Penal Code section 654 has not been applied consistently."].) Perhaps unsurprisingly then, jurists reviewing sentences of persons convicted of both robbery and attempted homicide have arrived at different conclusions in their application of the rule. (Compare, e.g., *Lowe, supra,* 45 Cal.App.3d at p. 795; *Nguyen,* at pp. 190, 193; and *Nguyen,* at p. 196 (conc. opn. of Scoville, P. J. and Sonenshine, J.).[11]

---

[11] A juxtaposition of the opinions in *Lowe* and *Nguyen* is illuminating. In *Lowe,* the court stated that a "series of criminal acts with the objective of robbery which results in both a robbery and . . . [an] attempted murder of the same victim is within the rule of . . . section 654." (*Lowe, supra,* 45 Cal.App.3d at p. 795.) The court in *Nguyen,* by contrast, focused on the *inverse* of this proposition by stating that "a separate act of violence against an unresisting victim . . . , whether gratuitous or to facilitate escape or to avoid prosecution, may be found *not* incidental to robbery for purposes of section 654" (italics added). (*Nguyen, supra,* 204 Cal.App.3d at p. 193.) It further stated that, "[i]f the trier of fact determines the crimes have different intents and motives, [then] multiple punishments are appropriate." (*Ibid*.) Whereas the court in *Lowe* reversed and remanded for resentencing because it found it "apparent" that a homicide and attempted homicide in that case had been only "incidental to the robberies of the same two victims" (*Lowe,* at p. 795), the court in *Nguyen* found that "substantial evidence support[ed] the [trial] court's implied finding of divisibility." (*Nguyen,* 204 at pp. 190, 193; cf. *id.,* at p. 196 (conc. opn. of Scoville, P. J. and Sonenshine, J. [emphasizing that "[a] robber may not avoid multiple punishment when harming an unresisting victim or witness in an act extraneous to the objective of robbery,"

13

#### 4. *Analysis*

Here, there was substantial evidence from which the trial court could conclude that Vargas's objective and intent in perpetrating the attempted voluntary manslaughter differed from his objective and intent in perpetrating the robbery. Indeed, one could say that Vargas's objective and intent vis-à-vis the robbery was to deprive Doe of the marijuana, whereas his objective and intent vis-à-vis the attempted voluntary manslaughter was to eliminate a witness or to permanently deprive Doe of his life. Even if brandishing the gun and firing bullet number one into Doe's knee were to be classified as merely incident to the robbery, our review of the testimony at trial indicates it would not have been unreasonable for the trial court to conclude that Vargas's objective and intent had shifted to something far more sinister somewhere amid the ensuing hail of bullets two through eight. (Cf. *Nguyen, supra,* 204 Cal.App.3d at p. 196 (conc. opn. of Scoville, P. J. and Sonenshine, J. [opining that execution-style attempted murder of unresisting store clerk "was too extreme to serve the purpose of escape" and that "elimination of a witness is not an objective related to robbery"].)

Although the trial court did not articulate a finding that Vargas had harbored an objective and intent for the one offense that differed from the objective and intent he harbored for the other offense, such a finding might reasonably be implied from the fact that the trial court elected to impose multiple punishments. And ordinarily our review would end here, on the premise that, "so long as some substantial evidence to support the implied finding exists, there can be no reversal." (See *People v. Cohen* (1951) 107 Cal.App.2d 334, 341.)

---

but acknowledging that "acts . . . which facilitate escape from the scene . . . may sometimes be inextricable from the robbery"].)

But we cannot ignore the remarks of the trial court that trend toward an altogether different finding. These include the court's statements (see *ante*):

- That "[t]he robbery is inseparable from the attempt to kill;"

- That the "exact same conduct . . . [that] constituted the robbery [also constituted the] attempted voluntary manslaughter;"

- That "there was essentially one incident" that "was . . . very fast moving" and occurred within the span of "mere seconds;"

- That the time from "[t]he taking out the gun to the shots being fired is almost instantaneous,"

- That it "would be a different situation" "[i]f there was a robbery and . . . Doe was shot initially, and then . . . a minute later he's coming at Mr. Vargas, and then Mr. Vargas shoots him."

Nor (zeroing in on the topic of objectives and punishments) can we ignore the trial court's statements (see *ante*):

- That "the crime[s] did not have predominantly independent objectives;" and

- That, "[i]f the robbery and the attempted voluntary manslaughter were factually distinct, . . . it would be a different story, but . . . *to separate these out into two distinct fact patterns which merit two distinct punishments* under *different constructs . . . goes beyond what is appropriate* in this case" (italics added).[12]

_____

[12] Notably, the last two statements bulleted above are drawn from remarks the trial court made when discussing two topics—specially (i) concurrent versus consecutive sentences and (ii) reduction of the firearm enhancement (see *ante*)—as to which the topic of multiple sentencing is irrelevant. (See *Deloza, supra,* 18 Cal.4th at p. 594 ["[S]ection 654 is

15

In focusing on the trial court's remarks regarding Vargas's objectives, we do not mean to imply those remarks cannot be reconciled with the rule against multiple punishments. That is a determination for the trial court to make in the first instance.[13] But we do conclude remand is warranted to afford the trial court an opportunity to consider the rule and arrive at its own conclusion as to whether one of the sentences should be stayed.

---

irrelevant to the question of whether multiple current convictions are sentenced concurrently or consecutively. [T]he question of whether sentences should be concurrent or consecutive is separate from the question of whether section 654 prohibits multiple punishment."]; cf. *In re Wright* (1967) 65 Cal.2d 650, 655 ["multiple sentences [are] forbidden by section 654, [irrespective of] whether consecutive or concurrent"].) But of course the fact that these remarks were made with reference to sentencing topics *other* than multiple punishment does not mean they are irrelevant to an analysis under section 654, subdivision (a), or that they may simply be ignored.

[13] A likely explanation as to why the trial court did not discuss the rule against multiple punishments when it sentenced Vargas is that Vargas did not bring section 654, subdivision (a), to the attention of the trial court at the time of sentencing; nor did he otherwise object to multiple sentences. But the issue is not waived on appeal, as "[i]t is well settled . . . that [a] court acts in 'excess of its jurisdiction' and imposes an 'unauthorized' sentence when it erroneously stays or fails to stay execution of a sentence under section 654." (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.)

## III.  DISPOSITION

The matter is remanded to the trial court for resentencing.  In all other respects, the judgment is affirmed.


KELETY, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.